[See Case No. 4,012.]

MARSHALL (DORSETT v.). See Case No. 4,012.

## Case No. 9,128a.

### MARSHALL v. JEFFRIES.

[Hempst. 299.] [2]

Superior Court, Territory of Arkansas. Feb., 1836.

PLEADING AT LAW—MISNOMER—IDEM SONANS.

"Jeffery" and "Jeffries" are not idem sonans.

Error to Lawrence circuit court.

[1] [Reported by Hon. William Cranch, Chief Judge.]
[2] [Reported by Samuel H. Hempstead, Esq.]

Before JOHNSON and YELL, JJ.

MARSHALL (LEWIS v.). See Case No. 8,-327.

MARSHALL (LIGGETT v.). See Case No. 8,342.

## Case No. 9.128b.

### MARSHALL v. MARSHALL.

[18 Betts, D. C. MS. 36.]

District Court, S. D. New York. Feb. 10, 1851.

COLLISION — SECURED TO DOCK — BLOCKING PASSAGE—TUG AND TOW—DAMAGE BY TOW—LIABILITY.

[1. A vessel secured at a dock is entitled to keep that position against the voluntary approach of any other. Though its position blocks the passage of some other vessel, yet the law does not compel it to move; and if the moving vessel, in attempting to pass, should cause a collision, it will be liable to damages.]

[2. A tug, towing a steamer, collides with a vessel secured to a dock. It is claimed in defence that the tug was acting under the direct and immediate orders of the pilot of the steamer, and that the responsibility, if any, should rest with the steamer. Held. that these facts constituted no defence in an action against the tug.]

[This was a libel by George Marshall against Charles H. Marshall to recover damages for injuries sustained in a collision.]

BETTS, District Judge. The sloop Genius, owned by the libellant, when lying at the end of the pier, at Tenth street on the East river, was pressed against and injured by the steamer Goliah, owned by the respondent. The Goliah and Duncan C. Pell, steamers, were engaged in towing the hull of the steam boat Arctic from Rutgers street to the Novelty Works, the Duncan C. Pell on her starboard side and the Goliah on the larboard. The tide was on the last of the flood, and high water. Shell Reef lies off

Ninth street, and reaches nearly up to Tenth street, and is about in the middle of the river. Tenth street pier projects 40 feet further into the river than Ninth, and the space between the reef and Tenth street pier is estimated at 50 or 60 yards. The width of the three boats in tow was 154 feet. As the tow proceeded up the river, the position of the sloop Genius was noticed, and the wheels of the two steamers stopped a distance of two or three hundred yards below her, and she was hailed by the pilot of the Arctic to move from the pier to afford room for the tow to pass. He also sent out a boat with like directions to the Genius. But the evidence is conflicting upon the fact whether the boatman carried the message, the weight of it being against the testimony of the boatman that he had delivered the order. So also it is doubtful whether the hail of the pilot to the Genius was heard on board her. It is also proved by the libellant that those on the Genius had no reason to apprehend a collision until the tow had come too near her to leave her the ability to move from the pier, although, upon the evidence, there would have been ample time to do it after the hail given from the tow.

The points insisted on by the respondent in defense are that it was the duty of the libellant to have moved the sloop from the pier under the circumstances, and by so doing the collision would have been avoided, and that if the collision was occasioned by any fault of the tow, it is ascribable to the pilot of the Arctic, who had exclusive command of the three vessels, and that the owner of the Goliah is not responsible for it. Neither of these positions are maintainable. It was incumbent on the tow so to be conducted in moving through the harbor as to avoid vessels at anchor or lying at the dock. The Scioto [Case No. 12,508]. It had no authority to command or compel the sloop to leave her mooring at the wharf. Had it been easy for her to do so, and she had wilfully persisted in holding her place when it was apparent to her that a collision must be the consequence, the other party making ineffectual efforts to avoid it, the court might well hold she should bear the consequences of such perverseness.

The equitable principles guiding the decisions of courts of admiralty lead it to discountenance all wilful acts of obstinacy, as well as a disobliging spirit, when either promotes a misfortune to the party exercising them or to others; but I am not aware the power of the court has been carried further in reproof of such dispositions than to regulate the allowance of costs with a regard to it. The admiralty court, no more than a court of law, cannot invade a legal right or privilege, and take it arbitrarily away from the one possessing it. A vessel safely secured at a dock is entitled to keep that position against the voluntary approach and encroachment of any other. The pilot of a steamer has no higher authority than the master of any other craft in this respect, and neither can assume the right to order off a vessel so placed, because her position is to his disadvantage or danger. In the present instance, if there was not room for the passage of the tow, it was the duty of the pilot to have stopped its advance, and, if necessary, to have anchored until he could prevail upon the sloop to leave her dock, or obtain the interference of the proper dock or harbor master to compel it. The wrong, if any, was with the tow in attempting to sweep through a narrow passage with a width of vessels which endangered others at the docks, and the law imposes on them the necessity of so arranging themselves as to go through it without crowding upon and injuring others, although their movement may be thus impeded. The same rule would obtain if the sloop had been at anchor in the river. It would have been her duty, then, to relieve the tow to the extent of her ability by sheering on her cable, or giving way with sweeps, when practicable, but the vessel approaching her without compulsion or necessity could not require her to slip her cable for their relief, or put herself in any peril for their accommodation. After the tow had come so near the sloop that its drift indicated a collision, it would have been hazardous for her to move into the river with intent to go up or down, for she would thus place herself more directly in the path of the tow, and then it would be urged against her, in case of injury, that she had brought it upon herself by such movement. She had a right to suppose the steamers would take care to stop or back or veer off so as to prevent all contact with her in a conspicuous and fixed position.

There is no evidence that there would have been danger—even difficulty—for the tow to have anchored, nor is the court furnished with anything more than mere suppositions that there was not ample width of channel for them all, between the sloop and Shell's Reef. If the Arctic could with safety pass the reef, the Duncan C. Pell might go over it at that state of the tide, which would have extended the channel 49 feet; and if there is 60 yards from the shoal to the dock, or even 50, the tow might thus have kept a safe course through. This, however, was the concern of the tow, and not of the sloop; and, as the danger was foreseen and well understood by the former, she was under obligation to take proper measures to avoid it. The Tecumseh, U. S. Dist. Ct. [unreported]. The injury was inflicted by the Goliah, and, if it must be regarded as caused by the act of the pilot on the Arctic, that in no way renounces the responsibility of the defendant. Ang. Carr. 664, 665. He put his boat under charge of that pilot, and his situation is in no way varied that the pilot took his stand and gave orders on the Arctic, instead of upon the Goliah. The improper management

and direction of the Goliah by those to whom she was entrusted by the owner produced the injury sustained by the libellant, and he is answerable for that wrong to the same extent as if she had remained under the charge of her officers. The Duke of Sussex, 1 W. Rob. 273; Bussey v. Donaldson, 4 Dall. [4 U. S.] 206; Foot v. Wiswall, 14 Johns. 306; Denison v. Seymour, 9 Wend. 9 Indeed, the doctrine with respect to the obligations of tugs employed in towing vessels would seem to be that the steamer is responsible for damages inflicted by the vessel in tow, unless caused by an act of the latter, independent of the tug, and when it was not at the time in her power to prevent it. The Express [Case No. 4,596]. The duty is thrown upon her to so arrange the movements of the vessel in tow, if possible, as to prevent her coming in collision with any other. Id. But, even if the Goliah, in this case, might be regarded as under the motive power of the Atlantic, and propelled by her momentum, and not by her own voluntary action, the responsibility would remain the same. The owner, in placing her in that position, took on himself the risks consequent upon it, and being propelled against another vessel whilst so navigated subjects him to the same responsibility as if she had been governed by her own motive power independent of the Atlantic. The Express [supra]; The Hope, 2 W. Rob. 50; 9 Wend. 9; The Gipsy King [11 Jur. part I, O. S. 357].

In my judgment, the owner of the Goliah is answerable for the injury sustained by the Genius, and it must be referred to a commissioner to ascertain and report the amount. The libellant is entitled to recover the same with costs against the respondent.